STATE OF MISSOURI, Respondent, v. WILLIAM DIECKMAN, Appellant.

March 7, 1882.

1. An indictment for murder in the first degree will support a conviction for murder in the second degree.

2. Evidence of threats by the accused against the deceased, made a few hours before the homicide, are competent in a trial for murder.

3. Evidence of threats susceptible of an innocent interpretation, but which, if taken in connection with other threats made directly against the deceased, may have a guilty meaning, may properly go to the jury.

4. If, in pursuance of a previously formed design, one prepares his weapon, provokes another to combat, and kills him, his mental excitement at the time does not necessarily reduce the crime to murder in the second degree.

5. If the design to kill is suddenly formed under heat of blood caused by lawful provocation, the killing is murder in the second degree.

6. If the design to kill is suddenly formed under heat of blood produced by an assault upon the accused, the killing may be manslaughter in the third or fourth degree.

7. If there is evidence to go to the jury as to different grades of crime, the matter is properly left to the jury under proper instructions as to the different grades.

8. Evidence of statements made by jurors after the trial will not be received to impeach their verdict.

APPEAL from the St. Louis County Circuit Court, EDWARDS, J.

*Affirmed.*

M. F. TAYLOR, for the appellant: An indictment must put the parties upon guard as to the specific grounds upon which the charge is founded. — *Bowe* v. *The State*, 5 Mo. 364; *Watson* v. *The State*, 5 Mo. 497; *The State* v. *Matterson*, 6 Mo. 399; *The State* v. *Jones*, 20 Mo. 60. If not murder in the first degree, the crime was manslaughter. — *The State* v. *Starr*, 38 Mo. 277; *The State* v. *Holm*, 54 Mo. 165; *The State* v. *Banstetter*, 65 Mo. 154; *The State* v. *Weiners*, 66 Mo. 11. A declaration by a juror, after the trial, that he had answered untruly on his *voir dire* as to his prejudice, is admissible.— *The State* v. *Ross*, 29 Mo. 51; *The State* v. *Burnside*, 37 Mo. 348; *Batte* v. *Coffman*, 33 Mo. 78; *Farrar* v. *The State*, 2 Ohio, 57.

JOHN R. WARFIELD, for the respondent.

THOMPSON, J., delivered the opinion of the court.

The defendant was indicted for murder in the first degree; was convicted of murder in the second degree, and sentenced to twenty years in the penitentiary.

1. The first point which is pressed upon our attention is, that the indictment is defective, because the appellant's counsel says, the evidence, if it tends to show any offence greater than manslaughter, shows a killing by lying in wait. We do not see anything substantial in this. The indictment is a good indictment for murder in the first degree

under the statute. Such an indictment is sufficient to support a conviction for murder in the second degree, which is included in murder in the first degree. We suppose that. the learned counsel really means that, instead of the indictment being defective, there is a variance between what is charged in the indictment and the evidence. There is no such variance. There is no evidence whatever tending to show a killing by lying in wait. The evidence shows a killing in a broil and combat between the defendant and the deceased.

2. The next objection is, that the court admitted evidence of certain threats made by the accused on the day of the homicide; that the evidence failed to connect these threats with the deceased; and, therefore, that the court ought to have excluded them by a proper instruction, although not asked to do so by the defendant. Conceding that an error prejudicial to the accused on the trial of an indictment for a felony will entitle the defendant to have the judgment reversed, although the error was not brought to the attention of the trial court, by the proper objection and exception, yet we see no room for the application of the rule in this case, for we are of opinion that all the evidence which the learned counsel supposed the court ought to have been thoughtful enough to exclude of its own motion, although its attention was not called to the impropriety of allowing the jury to consider it, was perfectly competent evidence, and such as is always admitted on trials for homicide to show motive on the part of the accused. The evidence objected to need not be set out *in extenso* in this opinion. It is sufficient to say that it consisted of acts and expressions of the defendant on the day of the homicide and within a few hours of the time when it took place. Some of these expressions were in the form of direct threats against the life of the deceased, such as were testified to by the witness Solomon Moore, who swore that on the morning of the day of the homicide, the defendant told the witness, speak-

ing of the deceased, "If you will come over to-night, I will show you his life or his guts." Others were in the shape of vague threats of violence against some unknown person, such as were testified to by the witness DeHart, who was the bar-keeper of the deceased, and who testified that the defendant, being in the saloon on the day of the homicide, and before it took place, said, speaking of his knife, which he was whetting on an oil-stone, to a third person with whom he had tried to start a quarrel, "I will not need it for you, but I may need it for some one else." This knife was the same knife with which the killing was afterwards done. The testimony also showed that the defendant, on the day of the homicide and before it took place, got an unloaded double-barrelled shot-gun, took it away, and returned with it loaded; said that "he could kill two men with the loads in that gun and knock the rest down with the stock;" that he told the witness, who had taken the gun up, to put it down, and that the defendant then sat down by the side of the gun, and sat there until the deceased came home. In the same category are the expressions used by the defendant in conversing with the witness Garland, who saw the defendant about one o'clock of the day of the homicide, that is, about eight hours before it took place. He seemed boisterous, and when asked by the witness what was the matter, said he was "going to run the town," or something to that effect; that he met the defendant later in the day with a double-barrelled shot-gun on his shoulder; asked him if he was going to run the town; the defendant replied, "I am;" and in an answer to another question, said, "I will fix him." Or that testified to by Frank McDonough, who met the defendant at three or four o'clock on the same day, and the defendant said to him, "I have quit work up there, and am going down to get work, but am coming back to get even with somebody." Or that testified to by Earnest Hill, who met the defendant about

sunset of the same day. The defendant had a shot-gun which had caps on it; said "he was going over to settle up with Mertz, and if he did not do what was right, there would be a fuss there." He also said to the witness, "If you will come over there to-night, you can see the fun." Or that testified to by William Van Nort, who saw the defendant at four or five o'clock on the same day. The defendant said to him that he was waiting there for Mertz, who had gone to the lake hunting; that he was going to have a settlement with him, and was there going to work for another man named Herman Schleifer; that he intended to clean out that house that night, and that he was not afraid of them all.

In trials for homicide, previous threats made by the accused against the deceased, and previous acts of hostility or preparation, are allowed to be given in evidence provided they were so recent, or were connected with the circumstances of the homicide in such a manner that they may fairly be supposed to throw light on the motives of the slayer at the time of the killing. 1 Bishop's Cr. Proc. (3rd ed.), sects. 1107, 1109, 1110. There is often difficulty in determining whether such threats and such conduct are sufficiently near in point of time, or sufficiently connected with the fact of the homicide to be admissible for this purpose. But this case presents no such difficulty. Those of the expressions above detailed which were not aimed specifically at the deceased, were not, for that reason, incompetent. They were parts of a general chain of hostile threats and hostile preparation, taking place but a few hours before the killing, most of which were directed against the deceased by name, and none of which are shown to have been aimed against any other person. The court could not have excluded any of them upon the supposition that the jury might misinterpret them, as the defendant's counsel contends with reference to the statement made by the defendant that he was going to have a settlement with

the deceased.   Whether the word " settlement " there used should have an innocent or guilty interpretation was wholly a question for the jury.   It is a total misconception of the relative province of the court and jury to suppose that the fact that the defendant, in his testimony, may have explained these acts and declarations in such a manner as to make them appear consistent with an innocent motive, required the court to withdraw them from the jury.   That would have been to usurp the province of the jury by assuming conclusively that they would believe the interpretation of the prisoner.   Neither is it necessary, in order that threats should be admissible in such a case as this, that they should have been aimed against the defendant specifically. A general threat made by the slayer that he would *kill somebody*, has been held admissible, under such circumstances, as showing a general malevolent purpose at the time of the homicide.   *Hopkins* v. *The Commonwealth*, 50 Pa. St. 9, 15.

3. The third objection is that this was either a case of murder in the first degree by lying in wait, or else it was manslaughter, and that the court, therefore, erred in instructing the jury with reference to murder in the second degree.   We do not think so.   The testimony tends to show that the defendant had worked for about five months for the deceased, Henry Mertz ; that he had determined to quit the service of Mertz and enter into that of Schleifer, who, it seems, had offered him higher wages ; that on the day preceding that of the homicide he had announced this determination to Mertz, and that Mertz had requested him to remain one day longer and to hang up some meat, as he (Mertz) wanted to go a-hunting ; that Dieckman agreed to do so ; and that, accordingly, early on the following morning, Mertz went a-hunting ; that Dieckman had his breakfast at Mertz's house ; that he afterwards took his clothing and things to Schleifer's house ; that he returned to Mertz's and hung up the meat for Mertz, which job he

finished about three o'clock in the afternoon; that most of this talk and conduct, detailed by the witnesses already named, took place in the interval between the time when the defendant finished this job and when Mertz returned in the evening; that Mertz returned about seven o'clock in the evening, got his supper, and went up stairs; that the defendant, in the meantime, in making a settlement with the book-keeper of the deceased, got into an altercation about a charge of twenty-five cents for a pair of gloves more than the defendant claimed was the price agreed upon; that the deceased came in with his baby on his arm, disputed with the defendant and called him a liar, which epithet the defendant returned and told the deceased to come out and they would settle it; that the deceased told the defendant, "You can't bluff me;" that he followed the defendant out a few yards from the door, where they struggled together, or made passes at each other for a brief space of time, when the deceased staggered back and fell, saying that Dieckman had cut him; that Dieckman ran away, but was arrested that night in bed in a house in the neighborhood; that the deceased was found to have been stabbed with Dieckman's pocket-knife, once in the thigh and once in the abdomen, and that he died of the latter wound.

We have already stated that there was no evidence tending to show a killing by lying in wait. This need not be discussed. It seems equally clear that the evidence was such that it was properly left to the jury to say whether this was a case of murder in the first degree or murder in the second degree, or of manslaughter in the third or fourth degree. If the defendant prepared his weapons and planned beforehand to provoke deceased into this quarrel, for the purpose of killing him; and, in pursuance of this design, did so provoke and exasperate him, and in the scuffle which ensued, the deceased using merely his hands, the defendant drew his knife and killed him, not in necessary self-defence, not under a heat of passion produced by any blows which

he had received from the deceased, or by the opprobrious words which the deceased had used against him, but in pursuance of the previously formed design, — then we think it was murder in the first degree. The mere fact that he may. have been in a state of mental excitement at the time would not make it otherwise. *The State* v. *Ellis*, 74 Mo. 207, 217. If, on the other hand, there had not been a previously formed design, or if the killing was not done in pursuance of such a previously formed design, but in pursuance of a design suddenly formed, and under a heat of blood produced by the language and demonstrations of the deceased, then it was but murder in the second degree ; whilst, if the heat of blood were produced by an assault made by the deceased upon the defendant, the killing might be but manslaughter, either in the third or fourth degree. The learned judge instructed the jury as to these various degrees of homicide in an accurate and explicit manner, so far as we can see ; and the substance of these instructions is not complained of.

4. The last point is, that the court erred in refusing to allow the defendant to prove, in support of his motion for a new trial, that, after the jurors had returned their verdict and been discharged, certain persons heard them discussing their verdict with persons who had attended at the trial ; that the jurors stated that if the defendant had been an ordinary citizen of the county on trial they would have acquitted him under the testimony, but that they (the jurors) were satisfied from what they had heard before being summoned as jurors, that the defendant had a hand in the killing of his wife, and, believing this to be true, they were satisfied he was a bad man, and ought not to be allowed loose in the community. There is nothing in this. It is well settled in all jurisdictions, that affidavits of jurors will not be heard to accuse themselves of misconduct, or otherwise to impeach their verdict ; and the rule is of especial application where the affidavits relate to the motives or

grounds upon which particular jurors acted in arriving at the verdict. For much stronger reasons, evidence will not be heard of loose declarations of the same nature, made by the jurors to third persons.

We see no error in this record. The judgment is accordingly affirmed. Judge BAKEWELL concurs; Judge LEWIS is absent.