## THE STATE v. SCHAEFER, *Appellant.*

Division Two, May 16, 1893.

1. **Criminal Practice**: MURDER: VERDICT SUPPORTED BY EVIDENCE. A judgment of conviction of murder in the first degree will not be reversed on appeal as not sustained by the evidence, unless there is a total absence of evidence, or it fails so far to support the verdict that the necessary inference is that the jurors must have acted from partiality, or prejudice or have been controlled by undue influence.

2. ———: ———: IMPEACHING VERDICT. The verdict of a jury cannot be impeached by the affidavits of the jurors nor by the affidavits of persons who derive their information from jurors.

3. **Criminal Law**: MURDER: INSANITY: BURDEN OF PROOF. The burden of establishing the defense of insanity in a murder trial rests on the defendant.

4. ———: ———: ———: ———. Where the evidence shows that defendant was permanently insane prior to the homicide, it then devolves on the state to show that the offense was committed during a lucid interval and the court should so instruct.

5. ——: ——: ——: ——. Where, however, the evidence shows that, if the defendant was insane previous to the homicide, he continued so, and that there were no lucid intervals, a failure to instruct the jury that the burden is on the state to show that the homicide was committed during a lucid interval is not error.

6. ——: ——: ——: ——. Where the evidence strongly tends to show that defendant, for several years before the homicide, had a diseased mind, but does not show that it incapacitated him to distinguish between right and wrong and to know the consequence of his acts and that there was no provocation for the crime, a verdict of guilty will not be disturbed on appeal on the issue of insanity.

*Appeal from St. Louis Criminal Court.*—HON. JAMES C. NORMILE, Judge.

AFFIRMED.

*Dodge & Mulvihill* for appellant.

(1) The verdict of the jury is greatly against the weight of the evidence. There was no testimony in rebuttal. *State v. Carver*, 30 Pac. Rep. (Ore.) 315; *State v. Lowe*, 93 Mo. 547; *State v. Nelson*, 98 Mo. 415; *Green v. State*, 20 S. W. Rep. (Tex.) 712; *McLeod v. State*, 20 S. W. Rep. (Tex.) 749. (2) The affidavits were admissible to correct a mistake on part of the jury, and must be considered by court, and given such weight and credence as seems just and equitable. *Crawford v. State*, 2 Yerger (Tenn.) 60; *State v. McNamara*, 100 Mo. 100; *Wade v. Ordway*, 1 Baxter (Tenn.) 229; *Broty v. State*, 4 Yerger (Tenn.) 114; *Roeder v. Studt*, 12 Mo. App. 566; *Hudson v. State*, 9 Yerger (Tenn.) 408; *Bennett v. Baker*, 1 Hun 395; *Elledge v. Todd*, 1 Hun 43; *Moffett v. Bowman*, 6 Grattan, 219; *Wright v. Tel. Co.*, 20 Iowa, 195. (3) The court erred in not fully instructing the jury on the law as applicable to the case. In this case the burden of proof was on the state to show a lucid inter-

val. Habitual, permanent or chronic state of insanity being shown to exist, its continued existence will be presumed, and the burden of establishing a subsequent lucid interval at the time of the act, either civil or criminal, being done, rests on the state. *State v. Lowe*, 93 Mo. 547, and cases cited; *McLeod v. State*, 20 S. W. Rep. (Tex.) 749, and cases cited; *State v. Klinger*, 43 Mo. Mo. 127; Chamberlayne's Best's Evidence, sec. 405; *Menkins v. Lightner*, 18 Ill. 282; *Fisher v. People*, 23 Ill. 283; *Trish v. Newell*, 62 Ill. 196; *Titcomb v. Vantyle*, 84 Ill. 371; *Guild v. Hull*, 127 Ill. 523.

*R. F. Walker*, Attorney General, and *C. O. Bishop* for the state.

(1) The evidence presented but two theories; either a killing in cold blood, or the act of a madman wholly irresponsible. Both were presented to the jury in instructions which have received the unqualified approval of this court since its organization. (2) The alleged newly discovered evidence is merely cumulative, and is not supported by the affidavit of the newly discovered witness himself. *State v. Ray*, 53 Mo. 345; *State v. Welsor* (Mo.) decided February 14 (not yet reported). Nor by defendant's affidavit. *State v. McLaughlin*, 27 Mo. 111. (3) Jurors will not be permitted to impeach their own verdicts. *State v. Branstetter*, 65 Mo. 149; *State v. Shock*, 68 Mo. 552; *State v. McNamara*, 100 Mo. 100; *State v. Rush*, 95 Mo. 199. (4) Affidavits of counsel, or other persons, of the misconduct of the jury, upon information derived from particular jurors, will not be heard to impeach the verdict. Thompson and Merriam on Juries, sec. 445; *State v. Dieckmann*, 11 Mo. App. 538; affirmed, s. c., 75 Mo. 570; *State v. Rush*, 95 Mo. 199; *State v. Dunn*, 80 Mo. 681; *State v. Cooper*, 85 Mo. 256.

BURGESS, J.—Upon an indictment for murder in the first degree the defendant was convicted at the May term, 1891, of the St. Louis criminal court, and is now under sentence of death. He was charged with having, in the city of St. Louis, on September 21, 1890, shot and killed one Henry Grattan, with a pistol. The defense was insanity.

The testimony on behalf of the state was substantially as follows: Deceased was twenty-one years of age and a painter by trade. On the day of the homicide (Sunday), at about 6:30 o'clock in the evening, deceased and one Bentley went to defendant's residence. The three had been together during the afternoon and had made an engagement to go in company to a theatre that night. Defendant lived with his father and mother upon the second floor of a tenement building. Their apartments opened upon a rear porch overlooking a court or yard, to which access was had from the street through a covered hallway, a narrow passage between and under adjacent buildings. Bentley and Grattan entered this hallway, passed through into the yard and to the stairway leading to Schaefer's rooms. They called out, "O, George!" "O, George!" Defendant came out on the porch and looked over. As he did so, the other young men, supposing he would immediately join them, started back through the hallway to the street and reached the sidewalk, but had hardly done so when defendant stepped briskly from the hallway and raising his hand, with a pistol in it, shot Grattan through the head. Bentley cried out: "Schaefer, you son of a bitch, you have killed Henry Grattan." Defendant ran back into the hallway, while Grattan fell upon the pavement without a word and expired.

It appeared that defendant was very fond of the theater and of sensational literature, and had written the draft of a play involving an abduction, robbery, murder, and the accusation and acquittal of an innocent party. He wished to produce this play, act one of the parts, and had solicited the co-operation of Bentley and Grattan and a third young man named Griffin. He had read the play to them, designated their parts and given them some articles for "make-up," to Griffin a pistol and a wig or false beard, and to Bentley and Grattan each a dirk or dagger. The young men had sold the weapons because (as they said) they were afraid of being arrested for carrying them. This was known to defendant on the day of the homicide.

One witness for the state (Keough) testified that when Schaefer was called he came out upon the porch and looked over (the balustrade) to where Bentley and Grattan stood, and then went back into the house before going down stairs; that he raised the pistol and shot Grattan without a word, and then ran back through the hall-way. About an hour and a half after the shooting defendant was brought to the police station by a man, supposed at that time to be his father, and surrendered to the officers.

The testimony on the part of the defense tended to show that defendant had received some injury on the head in childhood; had differed somewhat from other children; when at school, though proficient in other branches, "lacked judgment" in mathematics; was given to the reading of "wild west" literature, and full of the idea of becoming an Indian brave; was fond of the theater, devoted a good deal of his time to the elaboration of his play; claimed to possess some magical powers for raising the devil; sometimes arrayed himself in wild west costume, with high boots,

and let his hair grow long; it was claimed that he had at one time been addicted to self-abuse, but there was no evidence of it other than his own statement that he had consulted a physician for it and been cured. It was shown that defendant had worked very steadily at his trade for several years, earned fair wages, and was a competent mechanic in his particular line of work.

The father of defendant testified in his behalf regarding his conduct and conversation preceding the shooting, and as the controversy in this appeal is mainly over this testimony, it is here set out at some length:

Joseph Schaefer, father of the defendant, stated that he lived at 1116 Cass avenue for about fourteen years; that his former occupation was that of a painter; that he was at home on the evening of September 21, 1890, and that George came home about six P. M. and ate supper with himself and wife. "After supper, and while I was eating yet, he was singing and we were enjoying ourselves right nice. While eating I heard some whistles, and afterwards I heard some names called. I don't hear good as I am deaf in my left ear. As soon as they hollored out at him I heard my wife say, 'George, they don't mean you, they mean George Geiss on the third floor; don't you go down.' The hollering was kept up and my wife went out on the porch, and when she came in I heard the gate slam, and my wife said, 'Oh, my God, now they have taken that foolish boy away.' He went down; I did not see him going down. He always lived with my wife and myself; he was over twenty years old.

"*Q.* Were you of the opinion that George was of unsound mind? A. Well, yes, sir.

"*By the Court.* What peculiarities of his have you noticed upon which you base your opinion? *A.* Well,

all the time wild talk and wild actions; then of course we had to take him almost like a child.

"*Q.* Do you know whether or not he (George) was addicted to the habit of self-abuse? *A.* I did not know it at the time, but I found it out afterwards. I found it out after he went to doctoring for it. He was being treated by a physician, and I found it out.

"*Q.* Can you tell us of anything else he would indulge in that led you to believe he was out of his mind? *A.* Well, I noticed him at first when he—about the hair; he didn't want to have hair on his eyebrows, and he went to pull it out, and he wanted to get the hair out all together; he didn't want to have no beard on; he talked queerly; get up on a chair and say, that is just the size he want to be, just like the shadow; he wanted nine foot; and then he talk like he wanted to build castles and buy O'Fallon Park, and build a castle on it; he want to buy the Visitation convent and build a big college, and then to learn the doctors.

"He wanted to build a big college, and a hospital where the Visitation convent is, and to endow it with about one million, or one and one-half millions to run it. He want to cure all sickness, leprosy, and all sickness that was going on. He wanted to learn the doctors to treat all those, and then get medicine out. He was going to teach the doctors himself. When he was vexed he was wild all the time then.

"He wanted to unite all the Indians, north and south, altogether against the whites, to kill the whites; that the white race was no good; that the Indians would not molest or tease anybody. He all the time, whatever plan he had, he all the time wanted to be the head or leader of it. He would let his hair grow long; he always liked long hair; he would make plans to build men-of-war—sometimes he would say one thousand or a couple of thousand—to go to Europe; he wanted

to go to Ireland and be their king, and at other times he want to go to Africa; when the fight was there, he wanted to bring the Indians to fight the Zulus and conquer them, and then be their king or emperor in Africa; he thought he would go all over Europe and conquer it and all the time he would be the head man.

"*Q.* Did he ever entertain the notion of mutilating thimself? *A.* Oh, yes. We had awful trouble tha time he threatened to. He wanted to do that in order to get big. He had his idea that he would then get his nine feet, and stout, extraordinarily stout, too; and he often threatened that he would pay any amount to a doctor or to any one to do it for him; and, of course, we all the time threatened him that if he do anything like that, we have to lock him up in a crazy asylum; and then I told him that any doctor that would undertake to do a thing like that, that I would prosecute him as high as I could. But then I was afraid, often and often, that he would do it himself, only I frightened him. I say if he do it, it would kill him, kill him right off.

"*Q.* Do you know what that is (handing paper, marked exhibit A, to witness)? *A.* A play. He was all the time practicing. When he would be eating supper the first thing he would go out of the room, he would have a big revolver in his hand, and walk the length of the room where the looking glass was, and then would walk quick away just like somebody else, like he wouldn't have nothing at all; walk away again, come in, come out, and other times he had a knife. He always wanted to play the part of the villain in his play. He was to abduct the banker's daughter, and kill the banker, get his money and escape; he was supposed to be hired by another to do this; he also attempted to create a new language, somewhat like the Volapuk, only better and easier. With this new language he was to communicate with the devil. *Q.* Is this the lan-

guage (exhibits B and C)?   *A.* Yes; that is the A, B, C; he said he would go to the graveyard at night and talk to the devil.   One day my wife told him was going plumb crazy.

"He all the time supposed that he was the owner of gold mine, or gold well, and all he had to do was to go and get it, and he would have money enough to carry on all his schemes.   When he was acting his play he had weapons and false beard that he would put on and take off at times.

"He said he went down town for the purpose of renting the Grand Opera House, but was afterwards afraid that they would know that he was not a real actor, and that the detectives would arrest him; he also wanted to play at the exposition.   This was last fall after the fair.   He thought he had the exposition rented for a week and he would get two thousand dollars a night.

"At the age of three years he was thrown on a stove by his sister and so injured that he had to be taken to a doctor, and a syringe had to be used in his ears; afterwards, when he was twelve years old, he was struck on the head by a large boy who threw a half brick and cut his skull on the side; after he received this blow in the head he became more light than before.   From the effect of the first injury when he was a child his ears discharged all the time; this is the time he was thrown on the stove; after that he always complained about his head.

"He had two large sheets, with three circular rings on them, and many strange figures, letters, signs, and crosses; with these things he said he would go to the graveyard, and by their aid he would force the devil to appear.   The devil was to make him large, take all the pimples and blotches off his face; also he would receive great power and a horse, with which he

could fly in the air. All he had to do was to stamp on the ground and a big horse would appear, one that he could ride a mile a second on. He always had these notions, even when he was little. I had an aunt that was insane; at one time, when I was in New Orleans, they said I was crazy, but it was sickness; I forget all my relations at home.''

On cross-examination the father testified that his daughter, by his first wife, was kind of light, at least she acted that way. "In regard to the weapons he (George) had I did not interfere with his having them, because he said if I did he would kill himself, or jump in the river; he always made such threats. In writing his play he would sometimes dwell for days upon one simple word, and would ask me the same thing over a hundred times, all the time the same thing. I would have to coax him to do things; I could not command him or he would get wild; the evening of the shooting he came home about 6 P. M., and his mother called him upstairs; there was nothing unusual about his conduct; he was nice and pleasant, and said what a nice time he had with his comrades, that they praised him up about his singing, and he sang two or three songs, and we were all happy; knew on Sunday that the boys had taken his knives and pistol. George complained about this and said:  'Father, I have a good notion to get those boys arrested.' I advised him to let it alone, and not go with those boys any more, or say anything to them. This was Sunday before dinner. Nothing more was said about it, and he promised me he would not go or talk with them.

"*Q.* And he promised you he would not hurt them nor would not shoot them? *A.* He didn't say that he would do anything to them, only he said he wanted to get them arrested.

"*Q.* Was he excited at the time? *A.* No; only asked my opinion about it. When I heard the calling of George, he was sitting on the table, with no sign of excitement; afterwards he was dancing a jig and his mother was singing. I never saw him carry a pistol before, nor with one that day; he was getting $6 per week at Ramlose shoe factory, and would give the money to his mother each week, and she gave him $2 a week for spending money. He was always sickly, and we gave him this money to encourage him.

"*Q.* When did you first learn that young Grattan was shot by your son George? *A.* I noticed when I was down and went after my boy, when I ran after him.

"*Q.* When did you go after him? *A.* Well, after he was down my wife was after him; then he rushed in the room and he passed through me in the other room, and then come out again, and I see he was wild, and I grabbed him with my two hands around the body to hold him, and I said, 'George, George, don't go down; don't do anything out of the way; don't put us to shame; stay up here; don't go down.' But he succeeded; he was too strong for me; I slipped and fell on the floor, and as soon as I got up again I run after him, and I see some women standing there, and I said, 'What is the matter? What is up?' And they said, 'Well, we'd like to know ourselves.' And then I started to go out in front, out on the pavement, and my wife met me and grabbed me, and said, for God's sake, don't go out, that he is dead; and I said, 'Let me go, I must go and see him.' I thought my boy was shot; and by that others come in and say, 'Well, that Henry Grattan is shot.' I next saw George at the police station, one or two hours after. I heard he was there."

The court instructed upon murder in the first degree and insanity as a defense.   After verdict defendant filed his motion for new trial, alleging (in addition to the customary grounds) that the verdict was decided by means other than a fair expression of opinion on the part of all the jurors, and that the jurors totally misunderstood certain material facts in evidence, in support of which allegations he filed affidavits of eight of the jurors, and the affidavit of one of his attorneys as to what had been told him by two other jurors; also that some material evidence had been discovered since the verdict, supported by affidavit of counsel only.   During the trial, exceptions were saved to nothing but the instructions.

After conviction, defendant filed the usual motion for a new trial, which being overruled, the cause is here by appeal.

It is contended that the verdict is against the evidence, and that for that reason if no other the judgment ought to be reversed.   It has been repeatedly held by this court, that it will not reverse a judgment even in a criminal case on the ground that the verdict is against, and not supported by the evidence, unless there is a total absence of evidence, or that it fails so far to support the verdict that the necessary inference is, that the jury must have acted from partiality or prejudice, or have been controlled in making their verdict by undue influences.   *State v. Warner*, 74 Mo. 83; *State v. Musick*, 71 Mo. 401; *State v. Cook*, 58 Mo. 546.

Nor will the affidavits of jurors be received to impeach their verdict.   This has been so often decided by this court that it is scarcely necessary to cite its decisions which announce this rule.   *State v. Underwood*, 57 Mo. 40; *State v. Rush*, 95 Mo. 199; *Woodward v. Leavitt*, 107 Mass. 453; *State v. Branstetter,*

65 Mo. 149; *State v. McNamara*, 100 Mo. 101. The same rule applies to the affidavits of other persons, as to the misconduct of the jury, upon information derived from particular jurors. *State v. Cooper*, 85 Mo. 256; *Slate v. Dieckman*, 11 Mo. App. 538, affirmed in 75 Mo. 570; *Drummond v. Leslie*, 5 Blackf. 453; *Clum v. Smith*, 5 Hill. (N. Y.) 560; Thompson and Merriam on Juries, sec. 445.

The insanity of defendant was the only defense relied on in the trial court, and defendant's counsel insist that the judgment should be reversed upon alleged error committed by the court in its charge given to the jury, and in failing to instruct the jury that after, as they, contend, the insanity of defendant was shown to have existed long prior to the time of the killing and to have been permanent, and presumed to have continued down to the time of the homcide, that it devolved upon the state to overcome this presumption, and to show that the homicide was during one of defendant's lucid intervals.

The charge complained of is as follows: "By the indictment the defendant stands charged with murder. To this charge he pleads not guilty, thereby raising an issue of fact between him and the state. You the jury must determine by the evidence in connection with which the court instructs you as follows:

"If you believe and find from the evidence that the defendant at the time and place set forth in the indictment with a loaded pistol shot and killed Henry J. Grattan and that he did such shooting and killing feloniously, willfully, premeditatedly, deliberately and of his malice aforethought, you will find him guilty of murder in the first degree, and unless you so believe and find you should acquit him.

"If you convict the defendant of murder in the first degree you will merely say so in your verdict. To the

court belongs the duty of assessing the punishment; the law provides for this offense.

"As used in the indictment and in these instructions, willfully means intentionally and not done by accident. Feloniously means wickedly and against the admonitions of law. Premeditatedly means thought of beforehand for any length of time, however short. Deliberately means done in a cool state of the blood and not done in a sudden passion engendered by a lawful or some just cause of provocation.

"By the term malice is meant that condition of mind which prompts one to take the life of another without legal justification or excuse. This is its legal meaning, and not mere spite, ill will or hatred, the sense in which the term malice is commonly understood. And by malice aforethought is meant that the act of killing which this condition of mind prompts one to commit must have been premeditated.

"Insanity is interposed by the counsel of the defendant as an excuse for the charge set forth in the indictment. This defense, when established, is one the law recognizes, and should insanity be proven by the evidence in the case to the reasonable satisfaction of the jury, it would be the duty of the jury in that event to acquit the defendant altogether.

"Insanity is a physical disease located in the brain, which disease so perverts and deranges one or more of the mental and moral faculties as to render the person suffering from this affliction incapable of distinguishing right from wrong in reference to the particular act charged against him; and incapable of understanding that the particular act in question was a violation of the laws of God and of society, wherefore the court instructs the jury that if they believe and find from the evidence that at the time he did the killing charged in the indictment the defendant was so perverted and deranged in

one or more of his mental and moral faculties, as to be incapable of understanding at the moment he killed Grattan that such killing was wrong and that he, the defendant, at the time was incapable of understanding that this act of killing was a violation of the laws of God and of society, if the jury find he was so insane they should find him not guilty.

"Insanity is either partial or general. General alienation always excuses. Partial insanity does not always excuse. One may be partially insane and yet be responsible for his criminal acts. The law does not excuse unless the derangement is so great that it actually renders the person incapable at the time of its commission of distinguishing between right and wrong in respect to the particular act charged and proved against him.

"The law presumes every person who has reached the years of discretion to be of sound mind and this presumption continues until the contrary is shown. So that when, as in this case, insanity is pleaded as a defense to a criminal charge, the fact of the existence of such insanity at the time of the commission of the homicide charged, must, before you can acquit on that ground, be established by the evidence to your reasonable satisfaction, and the burden of proving this fact rests with the defendant.

"To establish the insanity of defendant, positive and direct proof of it is not required. To entitle him to an acquittal by reason of his insanity circumstantial evidence which reasonably satisfies your minds of its existence is sufficient.

"As the law presumes the defendant innocent, the burden of proving him guilty rests with the state, and before you should convict him his guilt must be established beyond a reasonable doubt. On the other hand, to entitle the defendant to a verdict of not guilty by

reason of his insanity, the law requires him to prove it, not however beyond a reasonable doubt but only to your reasonable satisfaction.

"From all this it follows that although you may believe and find that the defendant did the killing alleged, yet if from the evidence you further find that at the time he did it he was in such an insane condition of mind that he did not know he was doing wrong, and did not comprehend the nature and character of the act, then such shooting was not in law or in fact malicious or felonious, and you ought to acquit him on the ground of insanity; and by your verdict so say.

"The court instructs the jury that if they find the defendant not guilty on the ground that he was insane at the time of the commission of the homicide charged, they will so state in their verdict, and they will also state whether the defendant has entirely and permanently recovered from such insanity.

"The jury are the exclusive judges of the credibility of the witnesses; with that the court has nothing to do, and if you believe and find from the evidence that any witness has willfully testified falsely to any material fact in the case, you are at liberty to disregard the whole or any portion of such witness's testimony. The law presumes the defendant to be innocent, and this presumption continues until it has been overcome by proof which establishes his guilt to your satisfaction and beyond a reasonable doubt; and the burden of proving his guilt rests with the state. If, however, this presumption has been overcome by the evidence, and the guilt of the defendant established to a moral certainty and beyond a reasonable doubt, your duty is to convict. If of his guilt you are not convinced beyond a reasonable doubt, your duty is to acquit. But to justify an acquittal on this ground of doubt alone, it should be reasonable and substantial, and not

a mere guess or conjecture of the possibility of inno-
cence."

The foregoing charge in every essential particular,
when the defense was insanity, has been approved and
followed by this court since the case of *Baldwin v.
State*, 12 Mo. 223.    See *State v. Huting*, 21 Mo. 464;
*State v. McCoy*, 34 Mo. 531; *State v. Klinger*, 43 Mo.
127; *State v. Hundley*, 46 Mo. 414; *State v. Smith*, 53
Mo. 267; *State v. Holme*, 54 Mo. 153; *State v. Simms*,
68 Mo. 305; *State v. Redemeier*, 71 Mo. 173; *State v.
Williamson*, 106 Mo. 162.

The cases of *State v. Klinger, State v. Ridemeier*
and *State v. Williamson, supra*, were all cases where
the defense attempted to show long continued and
permanent insanity, prior to and up to the time of the
homicides, as in the case in hand.    And when, if the
insanity was once established was presumed to con-
tinue and to exist at the time of the killing.    *State v.
Lowe*, 93 Mo. 547.    These authorities show beyond
question that the burden of showing to the reasonable
satisfaction of the jury that defendant was insane at
the time of the commission of the homicide rested
upon him, and if the court had been satisfied that his
insanity had been shown to have existed at any time
prior to such killing, to be habitual, permanent or
chronic, then it would have devolved upon the state
to show that the homicide was committed during a
lucid interval, and the court should have so instructed
the jury.    But the evidence shows that if the defend-
ant was at any time previous to the homicide insane,
that he continued so, and that he had no such thing
as lucid intervals.

The state had the right to rest on the attempted
defense of insanity as set up by the defendant, and,
unless the evidence showed that defendant was insane
prior to and at the time of the homicide, it was not

The State v. Schaefer.

required to prove that it was committed during a lucid interval.

And if the trial court had been satisfied that defendant had been shown to be permanently insane previous to the killing, it is to be presumed that it would have instructed the jury that the burden was upon the state to show by competent evidence that it was done during a lucid interval. He who asserts error must make it manifest.

The evidence tends strongly to show that defendant had been for several years before the killing of diseased mind, although he had never been adjudged insane by an inquisition held. Nor had he ever been confined in a mad-house. This, however, was not necessary in order to establish his insanity. But the evidence does not show that his mind was so diseased that he did not know right from wrong and the consequences of his own acts.

There was the slightest provocation, if any, for the offense, growing out of the sale or disposition by deceased of a cheap pistol, some knives and other trinkets that defendant had furnished him and two others to prepare them to take part in a play which defendant attempted to write, and which was read in evidence. There was no justification or excuse for the offense, and, unless defendant was so insane at the time that he was not responsible therefor, under the law as declared by the court, he was clearly guilty of murder in the first degree. This was a question for the jury alone, under the evidence and instructions of the court, and we cannot say that there was no evidence to support their verdict.

The instructions presented every phase of the case fairly to the jury, and certainly as favorable to the defendant as he could hope for or expect. Judgment affirmed. All concur.