State v. Shackelford.

THE STATE v. SHACKELFORD, Appellant.

Division Two, March 7, 1899.

1. **Juror:** DISQUALIFIED: EVIDENCE BEFORE CORONER. When it is sought to disqualify a juror by reason of his having read the evidence before the coroner, it should appear that he read the evidence itself, not some garbled statement of it, nor a mere editorial or reportorial comment thereon.

2. **Evidence:** VERDICT: RESULT OF PASSION OR PREJUDICE. If it appear from the whole evidence that a verdict for murder can be ascribed only to prejudice, passion or partialty, the Supreme Court will set it aside. But none of these elements of unfairness is discoverable in this case.

3. ———: MURDER: CORPUS DELICTI. The evidence in this case is reviewed at length, and is held to establish not only that deceased died from poison, but that the defendant was one of the agents in administering said poison.

4. ———: CONFESSION. A confession is voluntary where no threats are employed to extort it and no promises are held out by the officer to obtain it.

---

State v. Shackelford.

---

*Appeal from St. Louis City Circuit Court.*—HON. WILLIAM ZACHRITZ, Judge.

AFFIRMED.

C. O. BISHOP for appellant.

EDWARD C. CROW, Attorney-General, for the State.

GANTT, P. J. —The defendant was convicted of murder in the first degree in the circuit court of the city of St. Louis at the June term, 1898. From the judgment and sentence of that court he has appealed to this court.

Without brief or assignment of errors we have been compelled to read every word of a transcript containing five hundred and fifty pages, in order to determine whether any substantial error was committed by the trial court against the defendant.

From the convening of the court at its February term, 1898, down to the signing of the bill of exceptions we discover no error in the record proper.

The grand jury was lawfully constituted, the indictment is a clear, logical, and technically sufficient charge of the murder of one George W. Taylor in the city of St. Louis on the twentieth day of November, 1897, by the defendant Thomas W. Shackelford and Nettie Taylor, by administering arsenic to said George W. Taylor in coffee.

The defendant was duly arraigned on the twenty-sixth of March, 1898, and entered a plea of not guilty. The cause was continued to the April term of that year. A severance was granted at the same term, and the cause was again continued by consent of defendant Shackelford to the June term, 1898. At the June term a trial was had, and defendant convicted as charged.

I.   Upon the *voir dire* examination of the jurors two of the panel of forty-seven jurors were challenged by counsel

for defendant, to wit, Joseph Schaub and Ernest Schlueter. Each of these jurors distinctly testified that the only opinions they had formed about the case were from reading the newspaper reports; that they could give the defendant a fair and impartial trial; that they did not know the prisoner or any of the witnesses or counsel in the case.

Some reference was made to the jurors' reading a copy of the evidence taken at the coroner's inquest but no effort was made to show that the jurors read the evidence itself and one at least answered that he could not say it was any more than the newspaper comment on the inquest.

When it is sought to disqualify a juror by reason of his having read the official evidence before the coroner, it should appear that he read the evidence itself, not some garbled statement of it nor a mere editorial or reportorial comment thereon.     Nothing of the sort was attempted in this case, and the challenges were properly overruled.

II.   Looking to the motion of defendant for a new trial in the circuit court for errors complained of on the part of that court, we find that at least five of the fifteen grounds. of that motion challenge the sufficiency of the testimony to sustain the verdict.    While it has been uniformly ruled by this court that we will not interfere with a verdict when there is substantial evidence to support it notwithstanding it may not clearly appear to this court that the defendant is guilty as charged [State v. Lowe, 93 Mo. 547; State v. Cook, 58 Mo. 546; State v. Schaefer, 116 Mo. 96], we have as steadily held that we have the right to consider the whole evidence and if it appears that the verdict can only be ascribed to prejudice, passion, or partiality this court will set aside that verdict, notwithstanding it may have received the approval of the trial court.    [State v. Lowe, 93 Mo. loc. cit. 569; State v. Castor, 93 Mo. 242; State v.Primm, 98 Mo. 368.]

We come now to inquire whether the evidence is so deficient in probative force as to require this court to overturn the verdict of the jury.

A careful synopsis of the evidence exhibits these facts. George W. Taylor and Nettie Taylor held themselves out to the world as husband and wife. They were negroes and had come to St. Louis from Memphis, Tennessee, as had the defendant Thomas W. Shackelford. They had resided some nine or ten months at No. 24 Targee street, in the city of St. Louis. Sometime in November, it appears the deceased and his wife were not living amicably. Deceased about this time went to the house No. 1505 Pine street, kept by another negro woman by the name of Mattie Jackson. Mattie Jackson's family consisted of herself and husband, and two unmarried daughters. She rented furnished rooms to others of her race. Deceased rented a room on the second floor and occupied it at night with Ethel Gibbons. The Gibbons woman only remained a few days and after her departure Taylor induced another negro woman, Fannie Jones, also a roomer in said house to occupy his room with him, and they had maintained this relation for some days prior to the twentieth day of November, 1897. On Saturday night, the nineteenth day of November, the defendant visited Taylor in his room at No. 1505 Pine street, and when he left that night remarked that he would come over next morning and breakfast with Taylor and the Jones woman, and Taylor invited him to do so. Defendant came next morning at 8 o'clock but as they had not yet risen he left and returned about ten o'clock that morning. Taylor, the deceased, called to him to wait and he would go with him to market. Deceased then left the house and procured a steak and tripe, and returned with defendant to the house No. 1505 Pine street. The Jones woman cooked the steak and tripe, also some cakes, oatmeal and coffee for the breakfast.

Defendant and deceased went to his room while the

breakfast was in preparation. Defendant offered his serv-
ices to bring the meal from the basement in which it was
cooked and brought it all up save the last plate of cakes
which the Jones woman herself took with her when she
finished. Deceased and the Jones woman ate the breakfast
but defendant declined to partake of it.

After breakfast defendant and deceased took a walk in
the direction of the river and returned in the afternoon, de-
ceased showing evidence of great pain and nausea. He
was assisted to bed and was very sick all night, vomiting and
suffering excrutiating pains in his bowels. Defendant re-
mained awhile after supper and left for his rooms 24 Targee
street.

On the following Monday morning the Jones woman
left deceased quite early to do some washing for a private
family. During her absence the defendant returned to the
house, No. 1505 Pine street, and went to Taylor's room.
Shortly afterwards he brought a pot of cold coffee into the
kitchen and asked leave to warm it for deceased. As his
pot was small, one of the young women, daughter of the pro-
prietor of the establishment, suggested it would boil quicker
if it was poured into the family coffee pot, which fitted the
holes in the stove. Accordingly she poured it into her
mother's coffee pot and warmed it. Defendant took this
coffee to deceased and deceased drank it and in about thirty
minutes began to vomit copiously and to complain of his
bowels.

The Jones woman failed to get her job that morning
and returned about 8 o'clock and drank some of the same
coffee and about thirty minutes later was taken violently
sick, vomiting and pains in the bowels. After warming
the coffee for defendant, one of Mrs. Jackson's daughters
without rinsing the pot made a cup of coffee for her mother.
Mrs. Jackson drank it and became sick with nausea and

vomiting. Obtaining no relief, Mrs. Jackson called a physician, Dr. Ryan on Tuesday. He visited her two days and prescribed for her, and on Thursday, Dr. Fenwick, another physician, came to the house and treated the Jackson woman.

On Tuesday, the wife of the deceased, Nettie Taylor came from her home, No. 24 Targee street, and spent most of the day with her husband. She made him some chicken broth and administered some powders to him. On Monday the Jones woman went after Dr. Curtis for Taylor, but failed to find him and meeting the defendant on the street and being told by him that the doctor was coming, she returned to the house. Though deceased's wife and defendant were advised of the presence of the two physicians in the house, neither was allowed to see the deceased.

Taylor continued to grow worse. On Wednesday his wife and defendant left him and returned to their rooms on Targee street. During Wednesday night Taylor managed to leave the house No. 1505 Pine street and reach his wife's rooms. No physician was called and he died Thursday night, November 25, 1897.

Dr. White testified he was a physician. His office was 1117 Morgan street. On the nineteenth day of November, 1897, in the morning defendant came to his office and desired to purchase some arsenic. The doctor refused to sell it to him and inquired for what purpose he wanted it. Defendant said he wanted to give it to a man and have the doctor visit him and after his death issue a burial certificate. That he wanted to ship the body to Memphis, Tennessee. Failing to obtain the arsenic of Dr. White defendant left and procured it of a druggist named Schroeder, No. 1401 Morgan street. Asked by Schroeder for his prescription, the defendant said he had told the doctor he would need it, but that Doctor White said, "Tell Dr. Schroeder it is all right, I am engaged now with a patient." After obtaining the arsenic he showed it to Dr. White.

Defendant after his arrest made the following state-ment to Captain O'Malley of the police force of St. Louis:

"A.  Well, he said, 'Captain, I was touted up to do this thing.' I said 'Who touted you up to it?' He said 'Nettie Taylor did.'

"Q.  Anything else? A. You want me to tell the substance of what he said?

"Q.  Yes, tell the substance and as near as you can give us the language as you remember it? A. He said that Mrs. Taylor, Nettie Taylor and George Taylor had a falling out, and that Taylor went to live with another woman over at 1505 Pine street, by the name of Fannie Jones, and I asked him what was the trouble between them. Well, he says she told him that Taylor brought her up here from Memphis and treated her bad and left her, and she also told him that she wanted to get him out of the way; that it would be better for both of them by getting George out of the way, and she suggested then to get some poison and put it in his food, and he said: 'Why, you can't get poison without you have a certificate,' or something to that effect—'you can't get it.' 'Well,' she said, 'This ain't in Memphis, you ain't in Memphis now. I think you can get it here.' And he said that she kept after him several times and finally she got mad about it and he says 'Well, I'll go and try.' So he went up, he told me then that he went to Dr. White and asked him for five cents' worth of arsenic and Dr. White asked him what he wanted it for, and he told him that he wanted to get rid of a man. Dr. White asked him the man's name that he wanted to get rid of, and he said his name was Charlie Johnson; and he asked him where he lived, and he said he lived at 1152 Chestnut street, and he went down to the corner he said of Eighth and Morgan, to a drug store there, and asked for the arsenic and he was refused. He came

back and went out to a drug store, I think it was on Fourteenth and Morgan, Dr. Schroeder's drug store, and there purchased five cents' worth of arsenic. On the way back he had to go by Dr. White's office. He was on the north side of the street and Dr. White's office I believe was on the south side, and Dr. White spoke to him and he came over to his office and he says, 'Doctor, I've got it,' and he opened it up on his counter, I think, and the doctor said, 'You got enough poison there to kill a regiment of soldiers.' He came back to Nettie Taylor's, he said, and he gave her the poison. That was a week or probably two weeks previous to Taylor's dying that this occurred. He also stated that he saw this package that he got at the doctor's office on the mantelpiece at Nettie Taylor's house; that is, 24 Targee street, where they were living, and that on Saturday evening he saw her mixing it up into pills. And he stated that on Sunday morning he went over to Taylor's to see George, at 1505 Pine street, he went over early that morning, and George and Fanny Jones were occupying the same apartment, and they were not up when he went over there, knocked on the door and in a few minutes he was let in. He said that George and he then went down to the grocery store to get something for breakfast. He said he had some tripe for breakfast, batter-cakes and some coffee. George ate his breakfast, defendant didn't eat anything, and after they had done eating breakfast why George said he ate too much, better go out and have a walk.

"Q. Who do you mean by George? A. George Taylor, George W. Taylor. And Shackelford and Taylor took a walk down town, went down as far as the levee, came back, and at Fourth and Market they noticed a pump in the middle of the block between Chestnut and Market, fronting the courthouse, and George went over there to have a drink, and all of a sudden he got sick, commenced to vomit, and threw up. They left there and in coming towards home they went

by the Globe-Democrat office, and he said that Nettie Tay-
lor's brother came out and slapped 'em both on the back and
I believe asked them where they were going, something to
that effect. He said that Nettie Taylor's brother and George
were not very good friends, they didn't talk much. Anyway,
they walked together as far as Fourteenth street, they sepa-
rated, George went up home to 1505 and Shackelford went
down to 24 Targee. He said he came home Sunday night
and told Nettie that George was very sick? He went over
again that same evening to Taylor's house and he remained
with him I guess up to ten or eleven o'clock at night, came
back home that night, and the next morning, Monday morn-
ing, he went over there again to see George, George was still
sick. That morning when he went over, there was nobody
in the—that Monday morning—there was nobody in the
room but George, and he had made some, he went down stairs
and got some coffee, made some coffee, and brought George
up some coffee. In the meantime Fannie Jones, who was out,
came back, and he told her she'd better go and get a doctor,
he was pretty sick, and Fannie went out to look for a doctor,
Dr. Curtis, I think, was the name of the doctor, and Shackel-
ford and Fannie Jones met near where this doctor's office
was, I think it was on Chestnut street somewhere, and Shack-
elford said to her, 'Did you find the doctor?' Fannie said
to Shackelford, 'Did you find the doctor?' He said 'No,
the doctor ain't in. I'll show you his office, so's you can
know where to find him in case you want him to come again.'
And they came back and in coming back from the doctor's
to Taylor's house, where he was rooming on Pine street, they
met Nettie Taylor, and all three went up stairs together,.
and Nettie said, 'You go over to Franklin avenue and get
Dr. Valley.' He says, 'Franklin avenue is a long street.' So
he got outside the door and she followed him out and she said,
Take those two powders, stay a little while and come back.'
He said he went out to the saloon on the corner and had a

drink, stayed a little while and came back and give the powders to Mrs. Taylor. He said he saw Mrs. Taylor giving him one of the powders.

"Q. Anything else, captain? A. That's as far as I can remember about that part of the statement. Then I asked him how much he was going to get for his trouble for doing all that. He said if Taylor's remains were shipped away and everything was all right, that he was to get a hundred dollars. He also told me about him telegraphing to Mrs. Taylor about the death of George W. Taylor.

"Q. Tell us what he said about that? A. He said that he went up to this place where George Taylor was employed and got fifteen dollars that was due him there—was due George W. Taylor—and that Mrs. Nettie Taylor sent him to the telegraph office to telegraph to the insurance company that Taylor was dead, and also telegraph to his mother that he was dead. Got an answer from the telegram to the insurance company stating to forward seven dollars and they would forward his insurance policy in good shape.

"Q. Did he state anything as to anything that occurred at 24 Targee street while Taylor was there, about his death? A. He stated that at three o'clock, about three o'clock that morning, Taylor came to the house at 24 Targee street; that he was admitted by Mrs. Taylor and went to bed, and he was in bed just a little while he said when he heard the noise of somebody falling out of the bed, and Nettie Taylor called his attention, she says: 'George fell out of the bed, come and help me put him back.' So they put him back in bed. The second time he fell out, out of the bed, and was put back. She said, 'I believe George is dead.' And he said he felt him and saw that he was dead, and Nettie Taylor said, 'Go and get a doctor,' or Shackelford said, 'Go and get a doctor,' and Nettie said, 'No, don't get a doctor, it would only create an excitement in the neighborhood, create an alarm.' She said, 'You

better notify the coroner.' He says, 'All right, notify the coroner.' "

A *post mortem* examination by Dr. Neitert revealed that Taylor was a well developed negro man, weighing about one hundred and eighty pounds, about thirty years old. The mucous membrane of the lips showed a marked reddening over normal. The mucous membrane of the oesphagus and in the stomach was highly inflamed, being very red, intensely red and swollen, and covered with thick, stringy mucus. The dependent portion of the stomach had been destroyed by the embalming fluid. The heart, kidneys, and bowels had been so completely enveloped in the embalming fluid that no opinion could be formed as to any pathological condition in those functions.

Dr. Nietert testified that the inflammation of the mucous membrane of the oesophagus and stomach was caused by some substance prior to death, and that in his opinion this inflammation caused Taylor's death; that it was such an irritation as would be caused by poisons, or might have been produced by decaying food in the stomach. There was no evidence in the stomach or liver of systematic disease which would have caused the inflammation found.

On the morning after Taylor's death, the defendant and his wife sent for the undertakers and had the body embalmed and began a dicker to have the same undertaker ship the body to Memphis, Tennessee.

In order to satisfy them as to their charges, defendant and Taylor's wife produced an insurance policy on Taylor's life, and a receipt for the last payment showing it had not lapsed, and assured the undertakers it was all right and gave directions to ship the body that afternoon to Memphis.

After selecting the coffin the undertakers were about to send their clerk to the insurance office to have the agent underwrite the claim when the police officers arrested both parties.

Defendant and Taylor's wife were fully identified by the Jackson family and the Jones woman as the parties who administered the coffee and the white powders to Taylor while he was at No. 1505 Pine street. It was shown that Taylor was in good health, a strong robust young negro man up to the Sunday on which he ate the breakfast at his room No. 1505 Pine street.

Do these facts sufficiently establish the *corpus delicti?*

It must be conceded that it is requisite to establish not only the death of George W. Taylor, about which there is no question, but that he died from poison and that defendant was at least one of the criminal agents in administering said poison and producing the death of said Taylor.

The evidence establishes that on the day previous or the day on which Taylor first became sick the defendant went to Dr. White and endeavored to purchase from him some arsenic, a deadly poison, with which to kill a man; that it was his deliberate purpose to administer it and then have Dr. White visit the patient and after his death give a burial certificate which would authorize the shipment of the body to Memphis. Dr. White having refused to enter into the conspiracy, defendant went to Dr. Schroeder, and by an artful story that Dr. White had sent him and was too busy to give a prescription, induced Schroeder to let him have the arsenic. He then returned and displayed the arsenic to Dr. White. The defendant then is shown to have in his possession a poison known by him to be deadly in its effect.

We next find him a self-invited guest to breakfast with deceased at his room at No. 1505 Pine street, a circumstance of no mean significance in connection with the sequel. When the paramour of deceased had prepared his breakfast Sunday morning, with unnecessary gallantry defendant assumed the role of waiter and went down two flights of steps to bring up the breakfast to deceased, thus obtaining the coveted opportunity of inserting some of the arsenic in the food. Although

he had expressed a desire to breakfast with deceased and it was now about noon, he unaccountably abstains from eating any of the breakfast. Deceased having partaken freely of the breakfast began soon to feel uncomfortable and suggested a walk and he and defendant started in the direction of the river. According to defendant's confession, corroborated fully by the sick and staggering Taylor on his return to the house, Taylor, the deceased, took a drink of water at a public fountain near the courthouse and instantly became violently sick and vomited copiously. He began his return to his room and vomited all the way home and reached there desperately ill and staggering. He went to bed and continued very sick all the night.

The poison not having accomplished its perfect work, defendant appeared early Monday morning on the scene and under the guise of a friendly act warms over a pot of coffee and administers that to his victim. Soon after the retching and vomiting begin anew, accompanied by excruciating pains in the stomach. Not only this, but the Jones woman also drank of this coffee and she too was soon similarly affected, and the Jackson woman also. It is no stretch of the province of the jury to find that some poisonous matter was in that coffee and that as defendant had sole charge of it, that it was in there by his agency.

Another significant circumstance is that defendant then brings the wife of Taylor on the scene. There appears to have been no effort to get him to return to her house but she remains with him and though the poisoned man asked for a doctor and his paramour, the Jones woman, attempted to get one, he was lulled with the promise that one would come and that one had sent some powders to quiet his stomach.

A still stronger circumstance is that although two physicians were in the house attending at different times the Jackson woman, and one had pronounced her case arsenical

poisoning, and their services were in a manner tendered defendant, Taylor's wife declined them.

Sick as Taylor had grown by Wednesday night, his wife and defendant left him and returned to their rooms 24 Targee street. Before day next morning Taylor in his desperation dressed himself saying he must get some fresh air and went out and managed to get to his wife's lodgings. He suffered there all day without a physician and died that night.

No other criminal agency is even suggested by the evidence. No suggestion of suicide can be found in the facts. If a motive be sought for it is not hard to find in the confession of defendant himself that Taylor's wife had concluded to rid herself of him on account of his relation with other women and to obtain the insurance on his life and that defendant for the one hundred dollars promised him willingly allied himself to the murderous scheme.

We think the evidence abundantly established the *corpus delicti.*

III. The objection that defendant's confession was not voluntary can not be sustained. No threats were employed to extort it and no promises held out by the officer to obtain it.

IV. The instructions were full, fair and correct, such as have often met our approbation and covered all questions of law involved in the record. No others were suggested by the experienced counsel who so ably defended the prisoner.

The case upon the whole seems to have been well and carefully tried and the guilt of the defendant fully established. The sentence and judgment of the circuit court is affirmed and the sentence of the law is directed to be executed.

SHERWOOD and BURGESS, JJ., concur.